**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| ASHLEY KUJAWA, | ) | CASE NO. 3:25-CV-1324 |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | JENNIFER DOWDELL ARMSTRONG |
| SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.    INTRODUCTION

The Commissioner of Social Security denied Plaintiff Ashley Kujawa's application for

Disability Insurance Benefits (DIB). Ms. Kujawa seeks judicial review of that decision pursuant

to 42 U.S.C. § 405(g). (Compl., ECF No. 1.) This matter is before me pursuant to Local Rule

72.2(b). (*See* ECF non-document entry dated June 26, 2025.)

For the reasons set forth below, I RECOMMEND that the Court AFFIRM the

Commissioner's final decision.

## II.    PROCEDURAL HISTORY

In December 2020, Ms. Kujawa applied to the Social Security Administration (SSA)

seeking DIB; she claimed that she became disabled on November 29, 2020. (Tr. 188.)[1] She

identified five allegedly disabling conditions: (1) scoliosis; (2) deafness; (3) attention-

deficit/hyperactivity disorder; (4) depression; and (5) severe headaches. (Tr. 204.)

---

[1] The administrative transcript appears at ECF No. 6. I will refer to pages within the transcript by identifying the Bates number printed on the bottom right-hand corner of the page (e.g., "Tr. 824"). I will refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 8") and page-identification numbers (e.g., "PageID# 1346").

The SSA denied Ms. Kujawa's application initially and upon reconsideration. (Tr. 69, 78, 79, 88.) Ms. Kujawa requested a hearing before an administrative law judge (ALJ). (Tr. 111.) The ALJ held a hearing on December 16, 2021, at which Ms. Kujawa was represented by counsel. (Tr. 35–68.) Ms. Kujawa testified, as did an independent vocational expert (VE). (*Id.*)

On January 3, 2022, the ALJ issued a written decision finding that Ms. Kujawa is not disabled. (Tr. 12–29.) Ms. Kujawa requested review of the ALJ's decision. (Tr. 185–86, 259–60.) The Appeals Council denied review in May 2022. (Tr. 1.)

Ms. Kujawa sought judicial review in this Court. *Kujawa v. Comm'r of Soc. Sec.*, Case No. 3:22-cv-1197-JGC (N.D. Ohio); *see also* Tr. 881. The parties stipulated that the case should be remanded back to the agency, and this Court subsequently ordered the remand. (Tr. 885.) The Appeals Council then vacated the ALJ's decision and remanded the matter to the ALJ with instructions for the ALJ to further evaluate the prior administrative medical findings, obtain additional evidence, and issue a new decision. (Tr. 888–90.)

The ALJ held a second hearing on November 22, 2023. (Tr. 832–50.) Ms. Kujawa's counsel submitted a pre-hearing brief in support of her position. (Tr. 1051–53.)

On January 11, 2024, the ALJ issued a second decision finding that Ms. Kujawa is not disabled. (Tr. 799–824.) Ms. Kujawa again sought Appeals Council review, and her counsel submitted a letter – brief regarding alleged errors in the ALJ's decision. (Tr. 958–60.)

On April 29, 2025, the Appeals Council denied review, rendering the ALJ's decision final. (Tr. 791.)

On June 26, 2025, Ms. Kujawa filed her Complaint, challenging the Commissioner's final decision that she is not disabled. (ECF No. 1.) Ms. Kujawa asserts the following assignments of error for review:

**First Assignment of Error:** The ALJ's assessment of dermatologist Dr. Heuring's medical opinions is not supported by substantial evidence.

**Second Assignment of Error:** The ALJ's evaluation of consultative examiner Katherine Karo, D.O.'s opinion is not supported by substantial evidence.

**Third Assignment of Error:** The ALJ's RFC finding is not supported because the ALJ's rationale for discounting Plaintiff's symptom allegations regarding her atopic dermatitis did not comport with apposite regulations and case law.

(Pl.'s Merit Br. at 10, 18, 20, ECF No. 8, PageID# 1346, 1354, 1356.)

### III. BACKGROUND

#### A. <u>Personal, Educational, and Vocational Experience</u>

Ms. Kujawa was born in February 1990 and was 30 years old on the date of her application. (Tr. 38, 188.) Ms. Kujawa graduated high school. (Tr. 39, 205.) She has worked as a cashier at a home improvement store. (*Id.*; *see also* Tr. 205.) She worked as a patient transporter at a hospital. (Tr. 40.) She worked for a home-cleaning service. (Tr. 55–56.) She worked as a pharmacy technician. (Tr. 56.) She most recently worked for a company in a role that had her packing drill bits into plastic packaging and marking the packaging. (Tr. 40.) She stopped working in August 2020. (Tr. 205; *see also* Tr. 1034.)

Ms. Kujawa lives with her two children. (Tr. 38.) She has a driver's license and has no problems driving, although her "eyesight isn't the best." (Tr. 39.)

#### B. <u>Function Reports</u>

Ms. Kujawa completed a function report in connection with her disability application; the form is not dated. (Tr. 211–18.) She wrote that she had "back pain and numbness." (Tr. 211.) She said that her ADHD causes her to become distracted "and think about everything." (*Id.*) She wrote that she is "sad a lot." (*Id.*) She identified that she wears a hearing aid, which was malfunctioning, and she believed that the resulting ringing noise was the source of her headaches. (*Id.*)

3

Ms. Kujawa said that on an average day she will wake up, take her children to school, pick them up, take a nap in the afternoon, eat dinner, and then go to bed at around 9 p.m. (Tr. 212.) She cares for her two young children without help from others. (*Id.*)

Ms. Kujawa awakes throughout the night with back pain, and she has sleep apnea. (*Id.*)

Ms. Kujawa reported that she has no problems seeing to her personal care. (Tr. 212–13.) She prepared her own meals, although the meals she makes are able to be made in about 10 minutes. (*See* Tr. 213.) She is able to clean the kitchen and perform other house and yard work that does not require her to bend frequently. (*See id.*) But sometimes she "gets in moods" where she has no energy and "just need[s] someone to give [her] a boost." (*Id.*)

Ms. Kujawa does not go outside unless she is required to do so. (Tr. 214.) She is able to drive and go out alone. (*Id.*) She shops for her groceries and household items on the computer. (*Id.*) She is able to pay her bills and handle a savings account, but she has a "phobia" about "handling change." (*See id.*)

Ms. Kujawa wrote that she has no hobbies. (Tr. 215.) She visits with her grandmother once per month, but otherwise she does not go anywhere except to doctors' appointments on a regular basis. (*Id.*)

Ms. Kujawa said that she can lift only up to 10 pounds and stand for 30 minutes. (Tr. 216.) She avoids squatting and bending. (*Id.*) Climbing stairs makes her "pelvis hurt." (*Id.*) She wrote that she can only pay attention for a minute or two and she forgets what she reads. (*Id.*) She does not follow written or spoken instructions well. (*Id.*) She gets along with authority figures well, but she does not handle stress well. (Tr. 216–17.)

Ms. Kujawa later told the Agency that she cannot talk to people "about [her] problems" because she has too much anxiety and depression. (Tr. 222.) She further wrote that her "scoliosis

keeps [her] in a lot of pain to work." (*Id.*) She said that her "hand e[c]zema is very painful" and reported that she had been prescribed muscle relaxers for her back pain. (Tr. 231.)

### C.      Relevant Hearing Testimony

#### 1.      *Ms. Kujawa's Testimony*

Ms. Kujawa testified that her hand eczema and back pain prevent her from working. (Tr. 42.) She described that her hands are red, inflamed, and "like cracking almost"; they feel as though they are "on fire." (Tr. 44–45.) She is treating with a dermatologist and has tried different ointments over the last few years. (Tr. 45.) She has recently started receiving injections to treat the condition. (*Id.*) Although the treatment is new, she has not noticed an improvement yet. (Tr. 46.) She finds that cold weather causes her symptoms to worsen. (*Id.*)

As of August or September 2020, Ms. Kujawa's hands had become "significantly worse," such that she could only work two days per week. (Tr. 43–44.) After two or three months of working only two days per week, she was laid off. (Tr. 44.)

Ms. Kujawa said that it was too painful for her to touch hot water with her hands, so she has difficulty bathing her young children. (Tr. 46–47.) She has difficulty washing hands, twisting open jars, or doing anything else that requires a grip. (*Id.*)

Ms. Kujawa testified that she has pain in her upper right shoulder and in her lower back. (Tr. 47.) She believes the pain is caused by scoliosis. (*Id.*) She wears a back brace and uses lidocaine patches and ibuprofen. (*Id.*) Ms. Kujawa is able to lift up to five pounds; if she lifts anything heavier, she feels a tightness in her lower back. (Tr. 48.) The back pain comes and goes; it is "sporadic." (Tr. 49.)

Ms. Kujawa reported that she cannot sit for more than an hour at a time, and she finds that lying flat on her back makes the pain worse. (Tr. 47–48.) She estimated that she can walk for

"maybe 30 minutes" at a time; she can walk for two blocks, or maybe a mile. (Tr. 42–43, 48.) She can stand for about 30 minutes before she needs to move. (Tr. 48.)

Ms. Kujawa testified that she has hearing difficulties. (Tr. 48–50.) She received a cochlear implant when she was a child. (Tr. 49.) She now uses a device that connects to her hearing aid through her phone. (*Id.*) With the device, she can "hear okay." (*Id.*) But she sometimes has a hard time hearing people in conversation, or hearing her kids call to her in the house. (Tr. 49–50.) She sets the television volume so loud that her kids will not watch it. (Tr. 50.) She has a hard time when there is loud background noise. (*See id.*)

Ms. Kujawa said that she was being treated for ADHD and depression. (Tr. 51.) She takes Adderall and Zoloft, but she has not noticed improvement on medication. (*Id.*) Her children help her take care of the house, and the children's father and a friend help her clean. (Tr. 52.)

At the second hearing, Ms. Kujawa testified that her ability to hear had not changed in the period after the first hearing. (Tr. 836–37.) She explained that she has difficulty judging where a sound is coming from and often uses lip reading to help her understand others in conversation. (*See id.*)

Ms. Kujawa said that her hand condition was also unchanged from the first hearing. (Tr. 837–38.) Her hands are "dry and cracked," bleed, and "burn as well like a burn fire." (Tr. 838.) Ointments, creams, and injections had all failed to improve her condition. (*Id.*) She wears fabric gloves daily after she applies lotion. (Tr. 839.) The burning pain "comes and goes throughout the day." (*Id.*)

Ms. Kujawa testified that her mental health had gotten worse since the first hearing. (Tr. 840.) She has been "crying a lot" and finds it hard to work up the "energy to do anything." (Tr. 841.) She finds herself getting distracted and has a hard time finishing what she starts. (*Id.*)

### 2.    *Vocational Experts' Testimony*

Bruce Growick, Ph.D., testified as a vocational expert ("VE") at the first hearing. (Tr. 51.) He classified Ms. Kujawa's past relevant work as that of a housekeeper cleaner (DOT 321.137-010), medical transporter (DOT 355.677-014), retail cashier (DOT 211.462-014), and hand packer (DOT 920.587-018). (Tr. 52–57.)

The ALJ asked the VE to assume that a hypothetical person with Ms. Kujawa's age, education, and work experience was limited to work at the light exertional level with several additional limitations. (Tr. 57.) Specifically, the person could frequently climb ramps and stairs but could not climb ladders, ropes, or scaffolds. (*Id.*) They could frequently stoop, kneel, crouch, and crawl. (*Id.*) They must avoid exposure to hazards like dangerous moving machinery, commercial driving, and unprotected heights. (*Id.*) They could not work in loud environments (like "heavy traffic noise levels"). (*Id.*) They are limited to simple, routine, and repetitive tasks in a work environment that is free from fast-paced production requirements (like moving assembly lines and conveyor belts). (Tr. 57–58.) Their work could involve only work-related decisions with few, if any workplace changes. (Tr. 58.) They can have no interaction with the general public and occasional interaction with coworkers and supervisors. (*Id.*)

The VE testified that such a person could not perform any of Ms. Kujawa's past relevant work but could perform the work of a machine tender feeder (DOT 754.685-014) or some independent assembly work (DOT 731.687-034). (Tr. 58–59.)

The ALJ next asked the VE to further limit the hypothetical person such that they needed to be able to alternatively sit or stand, alternating positions for one or two minutes in the immediate vicinity of the workstation every 30 minutes, while remaining on task for at least 90 percent of the

7

work period. (Tr. 59.) The VE testified that the two jobs he identified would remain available to such a person, but the number of available jobs would be reduced by around a third. (*Id.*)

The ALJ next asked the VE to further limit the hypothetical person to work at the sedentary exertion level. (Tr. 59–60.) The VE testified that such a person could perform the work of a bench assembler (DOT 715.684-026) or a surveillance system monitor (DOT 379.367-010).

Finally, the ALJ asked the VE to assume that the person from the first hypothetical could not use their bilateral upper extremities for reaching, handling, or fingering, would be consistently off task for more than 20 percent of the work period, and would be consistently absent more than four days per month. (Tr. 60–61.) The VE testified that any of those three additional limitations would render a person unemployable without an accommodation. (Tr. 61.) The VE confirmed that employers will tolerate absences of one and half days per month, up to 18 days per year. (*Id.*)

Ms. Kujawa's counsel asked whether the VE's opinions would change if the individual were limited to a "quiet work environment." (Tr. 67.) The VE confirmed that his opinions would not change. (*Id.*)

Karen Welsh testified as a VE at the second hearing. (Tr. 841.) The VE reclassified Ms. Kujawa's past relevant housekeeping work as that defined at DOT 323.687-014. (Tr. 844.) And the VE reclassified the past hospital work as that of a wheelchair aid (DOT 357.677-010). (Tr. 845–46.)

The ALJ asked the VE to assume that a hypothetical person with Ms. Kujawa's age, education, and work experience was limited to work at the light exertional level with several additional limitations. (Tr. 842.) Specifically, the person could frequently climb ramps and stairs but could not climb ladders, ropes, or scaffolds. (*Id.*) They could frequently stoop, kneel, crouch, and crawl. (*Id.*) They can frequently use the bilateral lower extremities for the operation of foot

8

controls. (*Id.*) They can frequently use the bilateral upper extremities for reaching, handling, and fingering. (*Id.*) They must avoid exposure to hazards like dangerous moving machinery, commercial driving, and unprotected heights. (*Id.*) They could not work in loud environments (like "heavy traffic noise levels"). (Tr. 842–43.) They are able to understand, remember, and carry out simple instructions for work that does not require a specific production rate or hourly quotas. (Tr. 843.) They are capable of using judgment to make simple work-related decisions with occasional changes in a routine work setting. (*Id.*) They can have occasional interaction with the general public, coworkers, and supervisors. (*Id.*)

The VE testified that such a person could perform Ms. Kujawa's past relevant work as a housekeeper/cleaner as reclassified (DOT 323.687-014). (Tr. 846.) The VE testified that such a person could also perform the work of a merchandise marker (DOT 209.587-034), mail clerk (DOT 209.687-026), or routing clerk (DOT 222.687-022). (Tr. 846–47.)

The ALJ next asked the VE to further limit the hypothetical person such that the person would need to be able to sit or stand alternatively for one or two minutes every 30 minutes in the immediate vicinity of the workstation, while remaining on task for at least 90 percent of the workday. (Tr. 847.) The VE testified that such a person would be able to perform Ms. Kujawa's past relevant work as a housekeeper/cleaner and would further be able to perform the work of a merchandise marker, mail clerk, or routing clerk. (*Id.*)

The ALJ next asked the VE to further limit the person to the sedentary exertion level. (Tr. 847–48.) The VE testified that such a person could not perform the work of a housekeeper/cleaner but could perform the work of a document preparer (DOT 249.587-018), surveillance system monitor (DOT 379.367-010), or addressing clerk (DOT 209.587-010). (Tr. 848.)

9

The ALJ next asked the VE whether any competitive employment would be available to a person who could not use their bilateral upper extremities for reaching, handling, and fingering, and who would be consistently off task for 20 percent of the work period, and who would be absent four days per month. (Tr. 848.) The VE confirmed that no competitive employment would be available to a person so limited. (*Id.*) The VE testified that employers will tolerate up to 10 percent off task and one absence per month. (Tr. 848–49.)

Ms. Kujawa's counsel asked the VE to consider the ALJ's first hypothetical question and further limit the person to only occasional use of the bilateral upper extremities for reaching, handling, and fingering. (Tr. 849.) The VE testified that none of the jobs she identified would be available for such a person, and further that no other competitive employment would be available to such a person. (Tr. 849–50.)

### D.        State Agency Consultants

A disability examiner (Gary Kasson), a physician (James Caccillo, M.D.), and a psychologist (Robyn Murry-Hoffman, Psy.D.) reviewed Ms. Kujawa's claim at the initial review level. (Tr. 69–78.)

Dr. Caccillo opined that Ms. Kujawa's reported limitations were only partially consistent with the medical record, writing that "[s]he has normal strength and range of motion." (Tr. 73.) The doctor limited Ms. Kujawa to occasionally lifting up to 20 pounds and frequently up to 10 pounds. (Tr. 74.) He identified that she could stand and sit for six hours in an eight hour workday. (*Id.*) He opined that she could frequently climb ramps and stairs but should never climb ladders, ropes, or scaffolds. (*Id.*) She can frequently stoop, kneel, crouch, and crawl. (*Id.*) She can hear sufficiently for conversation but should avoid "noisy environments." (Tr. 74–75.) Dr. Caccillo identified that she should "avoid even moderate exposure" to noise. (Tr. 75.)

Based on that opinion and Dr. Murry-Hoffman's opinions on Ms. Kujawa's mental health conditions, the consultants concluded that Ms. Kujawa could perform the work of a folder (DOT 369.687-018), bagger (920.687-018), or laundry worker (DOT 369.387-010) and was not disabled. (Tr. 77–78.)

In a letter to Ms. Kujawa explaining this decision, the Agency wrote that the medical evidence shows that she is able to perform activities like standing, walking, lifting, and carrying. (Tr. 94.)

A disability examiner (Sarah Loch), physician (Obiaghanwa Ugbana, M.D.), and psychologist (Aracelis Rivera, Psy.D.) reviewed Ms. Kujawa's claim at the reconsideration level. (Tr. 79–88.)

Dr. Ugbana agreed that Ms. Kujawa's description of her limitations was only partially consistent with the record, although he wrote that on some examinations her strength and range of motion was "slightly reduced." (Tr. 84) He opined that Ms. Kujawa's dermatitis on her hands was "not severe," explaining that "exams show no significant limitation in use of hands." (*Id.*)

Dr. Ugbana agreed with the initial level functional limitations, including that Ms. Kujawa has no manipulative limitations. (Tr. 85–86.) He wrote that Ms. Kujawa's dermatitis "does not show to significantly limit her ability to work." (Tr. 86.)

The consultants ultimately concluded that Ms. Kujawa could perform the work of a garment sorter (DOT 222.687-014), stuffer (DOT 731.685-014), or nut-and-bolt assembler (DOT 929.587-010) and was not disabled. (Tr. 88.)

In a letter to Ms. Kujawa explaining this decision, the Agency wrote that she was capable of performing work "which is less strenuous and less mentally demanding." (Tr. 105.)

E.    **Relevant Medical Evidence**[2]

The record contains photographs of Ms. Kujawa's hands. (Tr. 240–44.) Ms. Kujawa presented to dermatologist Erin Heuring, M.D. as a new patient on June 6, 2019. (Tr. 590.) Ms. Kujawa complained that her hands were "cracking and bleeding" despite over-the-counter lotions. (Tr. 594.) She reported that her symptoms had waxed and waned over a period of years, exacerbated by winter weather. (*Id.*)

On examination, Ms. Kujawa had xerotic plaques on her hands, without fissuring. (Tr. 595.) Dr. Heuring diagnosed dermatitis and prescribed a 0.1% triamcinolone ointment and instructed Ms. Kujawa to follow up in six months. (Tr. 595–96.)

Ms. Kujawa returned on December 5, 2019. (Tr. 581.) She said that the rash on her hands had gotten worse, which she attributed to dry winter weather. (Tr. 585.) She complained that her hands were itchy and painful. (*Id.*) On examination, Ms. Kujawa had xerotic erythematous plaques with no fissuring. (Tr. 586.) Dr. Heuring started Ms. Kujawa on a course of alternating augmented betamethasone (once a day) and tacrolimus (once a day) for one week. (Tr. 587.) Ms. Kujawa was instructed to use tacrolimus twice a day thereafter, restarting betamethasone if symptoms become worse. (*Id.*) Dr. Heuring instructed Ms. Kujawa to follow up in three months. (*Id.*)

When Ms. Kujawa followed up on March 4, 2020, she said that her condition was no better, even with consistent use of the ointments. (Tr. 348.) She described her hands as irritated and "very itchy" and said that she was having trouble working with her hands as a result. (*Id.*) On examination, Ms. Kujawa continued to have xerotic eczematous plaques on both hands, especially around her fingers. (Tr. 349.) Dr. Heuring diagnosed intrinsic atopic dermatitis of the hands, "severe with negative impact on" quality of life. (Tr. 350.) Dr. Heuring noted that she would seek

---

[2] Ms. Kujawa's argument in this appeal relates solely to her atopic dermatitis, and I therefore limit my summary of the medical evidence to those records relevant to that condition and the resulting limitations.

12

prior authorization for Dupixent (dupilumab) and instructed Ms. Kujawa to follow up in four months. (*Id.*)

On March 25, 2020, Dr. Heuring noted that prior authorization had been denied because of the limited body surface area of the rash. (Tr. 568.) Ultimately, it was approved through peer-to-peer review. (Tr. 567.) Ms. Kujawa was instructed to call for a scheduling appointment after hearing from the company to arrange delivery of the injection. (Tr. 561.)

Ms. Kujawa did not follow up until April 2021. (Tr. 540.) Ms. Kujawa reported that she had not taken the Dupixent because she was concerned about side effects. (Tr. 544.) She requested to continue on topical ointments but said that betamethasone had provided only minimal relief. (*Id.*) Dr. Heuring changed the ointment prescription to clobetasol. (Tr. 546.)

When Ms. Kujawa returned on September 1, 2021, she complained that her hands were still dry and painful. (Tr. 774.) She reiterated that she was concerned about trying Dupixent due to the possible side effect of hair loss. (*Id.*) After discussing the matter further with Dr. Heuring, Ms. Kujawa decided to start the medication. (Tr. 776.)

Ms. Kujawa did not start on Dupixent as planned; when she returned to Dr. Heuring on November 10, 2021, she explained that she was still nervous about taking the medication as she believed it would "clash" with her other medications. (Tr. 758.) Dr. Heuring noted that her eczema was not responding to topicals, and they developed a plan to trial Dupixent for four months and monitor for improvements. (Tr. 764.)

Dr. Heuring completed a medical source statement and an off-task/absenteeism questionnaire on the same day. (Tr. 685, 692.) She indicated that Ms. Kujawa had extensive lesions involving the hands, which were imposing marked limitations despite treatment. (Tr. 692.) She opined that Ms. Kujawa could not work for any portion of the day and could never perform fine

13

or gross manipulations with the hands. (*Id.*) Dr. Heuring marked that Ms. Kujawa was suffering from moderate pruritic and severe pain. (*Id.*) She marked that these limitations had applied since January 1, 2019. (*Id.*) She opined that Ms. Kujawa would be off task at least 20 percent of the time and would be absent about four times per month due to the pain in her hands (Tr. 688). Dr. Heuring did not provide a narrative explanation for her opinions.

When Ms. Kujawa followed up with Dr. Heuring on January 17, 2022, she reported a 60 percent improvement from the Dupixent. (Tr. 1201.) But she said that she did not want to be on the medication for the long-term and wishes to wean off the medication after six months. (Tr. 1202.)

At a follow-up appointment in March 2022, Ms. Kujawa said that she found the medication had not been helping much recently. (Tr. 1191.) She wanted to stop the medication because she thought it was causing hair loss. (*Id.*) Dr. Heuring stopped the Dupixent and started Ms. Kujawa on a roflumilast cream. (Tr. 1193.)

When Ms. Kujawa next met with Dr. Heuring in January 2023, she said that she had been using the cream three to four times a week "but has also been soaking her hands in salt water." (Tr. 1183.) She said the cream had helped with the inflammation. (Tr. 1184.) She said she thought she was not supposed to use the creams daily because of side effects. (Tr. 1183.) Dr. Heuring advised her to stick with the topical regimen and cautioned her that salt water may cause the hands to become more dry. (Tr. 1184.)

Ms. Kujawa returned in March 2023, complaining of no improvement in her condition. (Tr. 1176.) She said she still did want to take Dupixent. (Tr. 1177.) Dr. Heuring noted that she would seek prior authorization for phototherapy treatment. (*Id.*)

14

At an appointment in June 2023, Dr. Heuring noted that phototherapy had not been approved because Ms. Kujawa does not have psoriasis. (Tr. 1165.) Dr. Heuring wrote that Ms. Kujawa would appeal that denial, and in the meantime Dr. Heuring would refer Ms. Kujawa for a second opinion "due to lack of efficacy with standard treatments and the patient[']s apprehension towards systemic treatments." (Tr. 1167.)

Ms. Kujawa underwent a consultative examination with Katherina Karo, D.O., on October 19, 2023. (Tr. 1236.) Ms. Kujawa complained that she had had eczema for seven or eight years and receives only temporary and minimal relief from the creams, injections, and oral medications she has tried. (*Id.*) On examination, Ms. Kujawa had eczematous changes throughout the bilateral hands. (Tr. 1237). Dr. Karo opined that the painful eczema would limit her carrying, pushing, and pulling abilities (Tr. 1238, 1247). But Dr. Karo opined that Ms. Kujawa retained the ability to occasionally reach overhead, reach in all other directions, handle, finger, feel, and push/pull with the bilateral upper extremities (Tr. 1244).

When Ms. Kujawa met with Dr. Heuring on October 19, 2023, she said that her condition was the same. (Tr. 1253.) She had chosen to discontinue the new cream and had not followed up on the referral for a second opinion, due to transportation problems. (*Id.*) She said that her skin was itching and burning more. (*Id.*) She reiterated that she did not want to try systemic treatment. (Tr. 1255.) Dr. Heuring discussed starting a compounded roflumilast cream. (*Id.*)

## IV.    THE ALJ'S DECISION

The ALJ found that Ms. Kujawa met the insured status requirements of the Social Security Act through December 31, 2025. (Tr. 805.) The ALJ next found that Ms. Kujawa had not engaged in substantial gainful activity since the date of the alleged onset of disability (November 29, 2020). (*Id.*)

The ALJ next determined that Ms. Kujawa had the following severe impairments:

15

(1) attention-deficit/hyperactivity disorder, "combined type/mild ADHD"; (2) adjustment disorder with depression and anxiety; (3) bipolar disorder; (4) adjustment disorder;[3] (5) mild depression; (6) bilateral conductive hearing loss, status-post hearing aid anchoring; (7) anxiety disorder/mild anxiety; (8) hand dermatitis; (9) adolescent idiopathic scoliosis, lumbar, with low back and right-sided thoracic pain. (*Id.*)

The ALJ further found that Ms. Kujawa had a number of non-severe impairments: (1) eczema; (2) hand dermatitis;[4] (3) intrinsic atopic dermatitis; (4) acute non-recurrent sinusitis; (5) Treacher Collins syndrome; (6) left thigh dermatofibroma/benign nevus; (7) mild learning impairment; (8) chronic tension-type headache, not intractable; (9) acquired palmar and plantar hyperkeratosis; and (10) protein-caloric malnutrition. (Tr. 806.) The ALJ stated that he considered all of Ms. Kujawa's impairments, including those found non-severe, when developing the residual functional capacity. (*Id.*)

The ALJ determined that none of Ms. Kujawa's impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 806.)

The ALJ determined that Ms. Kujawa had the residual functional capacity ("RFC") to perform light work with a number of additional limitations. (Tr. 810.) Specifically, Ms. Kujawa cannot climb ladders, ropes, or scaffolds but can frequently climb ramps and stairs. (*Id.*) She can frequently stoop, kneel, crouch, and crawl. (*Id.*) She can frequently use her bilateral lower extremities for the operation of foot controls. (*Id.*) She can frequently use her bilateral upper extremities for reaching, handling, and fingering. (*Id.*) She must avoid all exposure to hazards like

---

[3] The ALJ identified adjustment disorder twice. (Tr. 805.)

[4] The ALJ identified hand dermatitis as both a severe and a non-severe impairment. (Tr. 805–06.)

16

dangerous moving machinery, commercial driving, and unprotected heights. (*Id.*) She cannot work in a loud work environment, "such as heavy traffic noise levels." (*Id.*)

With respect to non-exertional limitations, Ms. Kujawa can understand, remember, and carry out simple instructions for work not requiring a specific production rate (like assembly line work) or hourly quotas. (*Id.*) She is capable of using judgement to make simple work-related decisions and can cope with occasional changes in a routine work setting. (*Id.*) She can have occasional interaction with coworkers and supervisors. (*Id.*)

The ALJ found that Ms. Kujawa was capable of performing her past relevant work as a housekeeping cleaner, and further was capable of performing other work that exists in significant numbers in the national economy. (Tr. 822–23.) Specifically, the ALJ determined that—considering Ms. Kujawa's age, education, work experience, and RFC—she could perform the work of a "merchandise marker" (DOT 209.587-034), "mail clerk" (DOT 209.687-026), or "routing clerk."[5] (*Id.*) Accordingly, the ALJ determined that Ms. Kujawa is not disabled. (Tr. 824.)

## V. LAW & ANALYSIS

### A. Standard of Review

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v.*

---

[5] The ALJ erroneously identified this job as associated with DOT 209.687-026 (the entry for a mail clerk). The VE had testified as to a hypothetical person's ability to perform the work of a routing clerk, citing DOT 222.687-022. (*See* Tr. 847.)

17

*Comm'r of Soc. Sec.*, 615 Fed. Appx. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (cleaned up) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (quoting *Consolidated Edison*, 305 U.S. at 229).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, . . . a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

### B.        Standard for Disability

Consideration of disability claims follows a five-step review process. 20 C.F.R. § 416.920. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) (quoting 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. § 416.920(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 416.920(e). An RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). Agency regulations direct the ALJ to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

"A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio

19

Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support [the ALJ's] decision, especially when that evidence, if accepted, would change [the ALJ's] analysis." *Golden*, 2018 WL 7079506 at *17.

At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 416.920(e)–(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. § 416.920(g). *See Abbott*, 905 F.2d at 923.

### C.      Analysis

In her first two assignments of error, Ms. Kujawa contends that the ALJ erred in his consideration of Dr. Heuring's medical source statement and absenteeism questionnaire and in the evaluation of Dr. Karo's consultative evaluation opinion.

The SSA considers opinions from medical sources under five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors, such as familiarity with other evidence in the claim or with the disability program's policies and evidentiary requirements. 20 C.F.R. § 404.1520c(c).

Section 404.1520c(b)(1) specifically provides that "it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [the ALJ] considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record." 20 C.F.R. § 404.1520c(b)(1).

20

Of the five factors, supportability and consistency are the most important, and an ALJ must explain how the ALJ considered them. 20 C.F.R. § 404.1520c(b)(2). The ALJ "may" but "is not required to" explain how the ALJ considered the remaining factors. *Id.*

The "supportability" factor looks to how well the medical source supports the opinion with objective medical evidence from the record. See 20 C.F.R. § 404.1520c(c)(1). "In other words, the supportability analysis focuses on the physicians' explanations of the opinions." *Lavenia v. Comm'r of Soc. Sec.*, No. 3:21cv674, 2022 WL 2114661, at *2 (N.D. Ohio June 13, 2022) (quoting *Coston v. Comm'r of Soc. Sec.*, No. 20-12060, 2022 WL 989471, at *3 (E.D. Mich. Mar. 31, 2022)).

The "consistency" factor looks to how consistent the medical opinion is with evidence from other medical and nonmedical sources. See 20 C.F.R. § 404.1520c(c)(2). "As long as the ALJ discussed the supportability and consistency of the opinion and supported [the ALJ's] conclusions with substantial evidence within his decision, the Court will not disturb [the ALJ's] decision." *Njegovan v. Comm'r of Soc. Sec.*, No. 5:21-CV-00002-CEH, 2022 WL 1521910, at *4 (N.D. Ohio May 13, 2022).

Ms. Kujawa first argues that the ALJ failed to adequately consider Dr. Heuring's medical source statement and absenteeism questionnaire. The ALJ evaluated those opinions as follows:

> Dr. Heuring submitted various treating source statements. Dr. Heuring stated the claimant had extensive lesions that involved the claimant's hands and imposed marked limitations of function despite treatment. Dr. Heuring provided another statement, dated November 10, 2021, indicating the claimant would be off-task more than 20 percent of the day and would be absent more than four times a month due to her hand pain.
>
> However, Dr. Heuring's reports appear to contain inconsistencies, which renders her opinion less persuasive. Specifically, she indicated the claimant could work 0 hours in an 8-hour workday. However, she also indicated the claimant could stand for 8 hours and sit for 8 hours in a workday and lift up to 20 pounds on an occasional and frequent basis, which indicates a higher degree of functional ability than what one would expect if a person could not even work one hour.

Further, the alleged intensity and duration of the claimant's pain, as noted by Dr. Heuring is not supported by the objective medical evidence. The claimant pursued a conservative course of treatment to manage her symptoms. As discussed herein, the claimant was reluctant to use treatments Dr. Heuring had identified as being systemic agents, such [as] Dupixen[t]. Updated treatment notes show the claimant planned to continue standard treatment using Opzelura twice a day and try a compound romflumilast cream. Despite her conservative treatment modalities, the clinical findings upon examination and diagnostic studies did not support more restrictive functional limitations. For example, patch testing was within normal limits. As indicated in her treatment notes, Dr. Heuring consistently performed a focus examination of her hands, though she does not specifically detail these objective clinical examination findings. Rather, the medical evidence of record, including Dr. Sinha's examinations . . . and Dr. Karo's physical examination findings . . . fails to reveal evidence of limited range of motion, sensation loss, reflex abnormalities, or neurological deficits generally associated with prolonged intense and disabling pain that would be expected give[n] Dr. Heuring's assessments.

Dr. Heuring's assessment that the claimant could never engage in fine manipulation, gross manipulation, and never tolerate heat and cold is not supported with the claimant's own reports that she is able to eat, drive, text, and care for her children and cat . . . . It is not consistent with her reports that she enjoyed scrapbooking and had usual computer skills . . . . The record shows that the claimant was still driving as recently as October 2023 . . . . As discussed in greater detail herein, the claimant cared for young children during the relevant period . . . and maintained that she "always" had her children so she did not socialize[] . . . . The claimant helped get them ready and dropped them off at school, cleaned the kitchen and prepared her own meals . . . . She shopped for household item, clothes, and groceries, cared for a cat . . . . She admittedly texts others and drives . . . . In October 2023, the claimant disclosed to Dr. Karo that she remains able to drive . . . . Therefore, the undersigned does not find Dr. Heuring's assessments to be persuasive. During the relevant period, the claimant [reported] enjoying scrapbooking, having usual computer skills . . ., as well as [the ability to] drive . . . . The claimant was able to help her children get ready for school, drop them off to school, clean the kitchen and prepare her own meals . . . . She was able to use her cell phone to text . . . .

(Tr. 819–20 (internal citations to the record omitted).)

Ms. Kujawa contends that the ALJ's supportability analysis contained factual errors and improperly relied on physical examination findings unrelated to her atopic dermatitis. She says

22

that the ALJ ignored that Ms. Kujawa trialed Dupixent without significant improvement. She characterizes her treatment as "the most aggressive treatment course offered to patients with atopic dermatitis," including trialing Dupixent and seeking prior authorization for phototherapy. She includes in her brief citations to medical information about atopic dermatitis. Finally, she argues that the ALJ's reference to patch testing (ruling out an allergy) and examination findings regarding things like normal sensation are not inconsistent with disabling atopic dermatitis.

With respect to consistency, Ms. Kujawa argues that the ALJ relied too heavily on her activities of daily living in finding Dr. Heuring's opinions to be inconsistent with the evidence. And she says that there is no support for a conclusion that she could perform work consistently for an entire workday while remaining on-task sufficiently.

The Commissioner defends the ALJ's reasoning, pointing out that the ALJ relied upon Dr. Heuring's own records, in which she did not record specific examination findings (*See* Tr. 1167, 1193, 1202, 1254). And the Commissioner would have the Court agree that Ms. Kujawa's activities were "patently inconsistent" with Dr. Heuring's opinion that she had no ability to use her hands to manipulate at all. The Commissioner defends as reasonable the ALJ's characterization of Ms. Kujawa's treatment as conservative.

After careful consideration, I agree with the Commissioner that the ALJ's finding that Dr. Heuring's opinion was less than persuasive was supported by substantial evidence.

An ALJ's decision need not "fit neatly into the 'first assess consistency and supportability, then consider other factors' framework," as "the regulations do not require the ALJ to issue a perfect decision." *Merrell v. Comm'r of Soc. Sec.*, 1:20-cv-769, 2021 WL 1222667, at *6 (N.D. Ohio Mar. 16, 2021), *report and recommendation adopted*, 2021 WL 1214809 (N.D. Ohio Mar. 31, 2021) (citation omitted). And a reviewing court must read the ALJ's decision as a whole. *Taylor*

23

*v. Kijakazi*, No. 1:20-cv-01121, 2021 WL 4477865, *8 (N.D. Ohio Sept. 30, 2021). Thus, courts in this district have held that an ALJ adequately addresses supportability where the ALJ discusses the medical source's treatment records earlier in the decision, even if the ALJ does not specifically reference supportability when evaluating the medical source's opinion. *See Guthrie v. Comm'r of Soc. Sec.*, No. 3:22 CV 1309, 2023 WL 6258259, at *3 (N.D. Ohio Sept. 26, 2023) (holding that ALJ adequately addressed supportability by reviewing in detail evidence on which state agency psychologists relied); *Bradley v. Comm'r of Soc. Sec.*, No. 1:23-cv-00082, 2023 WL 8529099, at *8 (N.D. Ohio Dec. 8, 2023) (holding that remand was not warranted where decision, read as a whole, showed that ALJ adequately considered supportability of opinion).

Here, the ALJ accurately and thoroughly summarized the treatment record, including Dr. Heuring's own treatment notes. (Tr. 812–817.) While Ms. Kujawa points to medical evidence that she believes are consistent with Dr. Heuring's opinions, "the Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). A reviewing court may not "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)); *see also Anderson v. Comm'r of Soc. Sec.*, No. 1:21-CV-1471, 2022 WL 4545188, at *2 (N.D. Ohio Sept. 29, 2022) ("it is also well-established that as long as the ALJ cites substantial, legitimate evidence to support the conclusion reached, the reviewing court may not second-guess that decision"). Ms. Kujawa's argument is a request for the Court to reweigh the evidence, which it cannot do.

24

Moreover, I disagree that the ALJ's characterization of Ms. Kujawa's treatment was unreasonable. Ms. Kujawa was able to work until August 2020 while caring for two children, despite the dermatitis on her hands. She described that her condition waxed and waned over time. She delayed trying Dupixent and stopped taking it after only several months, despite significant initial improvement. She thereafter managed to continue caring for young children, driving, texting, managing her symptoms with prescription creams—even when she was not using the creams daily due to concerns about side effects. She did not follow up on a referral for a second opinion, and she repeatedly declined to consider systemic treatment options. While it is fair to conclude that Ms. Kujawa did not feel that her symptoms were adequately controlled on the prescription ointments, and that she continued to present with plaques in the bilateral hands despite that treatment, I do not find it to be reversible error for the ALJ to characterize her course of treatment as conservative. An ALJ adequately addresses consistency by noting that a treating source's opinion is inconsistent with modest treatment history. *E.g.*, *Preputnik v. Comm'r of Soc. Sec.*, No. No. 1:25-CV-00598, 2025 WL 3204717, at \*11 (N.D. Ohio Nov. 17, 2025).

The ALJ's decision does not suffer from the same deficiency as seen in *Melendez v. Comm'r of Soc. Sec.*, No. 1:13CV01720, 2014 WL 2921938 (N.D. Ohio June 27, 2014). There, the ALJ rejected a series of opined limitations based only on a conclusory statement that the limitations were inconsistent with the claimant's daily activities, where some or most of those activities were not performed on a daily basis and where it was not clear how the activities were inconsistent with the opined limitations. *Id.* at \*6.

Here, in contrast, the ALJ noted that caring for children, which Ms. Kujawa said she does daily, was "quite demanding both physically and emotionally." (Tr. 817.) The ALJ noted that she helped them get ready for school and dropped them off at school. (*Id.*) The ALJ noted that Ms.

25

Kujawa said she enjoys scrapbooking, has usual computer skills, does housework, prepares her own meals, and texts others. (*Id.*) The ALJ found significant that Ms. Kujawa drives, as "it shows no signs of pain that prevent her from using a steering wheel, an accelerator, or a brake." (*Id.*)

In short, the ALJ reasonably pointed to activities of daily living that could be seen as inconsistent with the opinion that Ms. Kujawa is completely incapable of manipulation of the hands and cannot work for even one hour every day.

I also agree with the Commissioner that medical records reflecting normal range-of-motion, sensation, and grip strength are relevant to the assessment of how persuasive were Dr. Heuring's opined disabling manipulative limitations. It was not reversible error for the ALJ to consider those findings in assessing the persuasiveness of Dr. Heuring's opinions.

Turning to Dr. Karo's opinion, the ALJ discussed that opinion as follows:

> Dr. Karo evaluated the claimant in October 2023, and concluded the claimant was capable of occasionally lifting and carrying to 20 pounds, sit for an hour without interruption, stand for an hour without interruption, and walk for an hour without interruption, sit for a total of 3 hours in an 8-hour workday, stand for 3 hours total in an 8-hour workday, and walk for 2 hours total in an 8-hour workday and did not require the use of a cane. She also stated the claimant would be limited to occasional overhead reaching, occasional reaching in all other directions, occasional handling, fingering, feeling, pushing, and pulling, occasional use of the foot control with both feet, occasional climbing of ramps and stairs, balancing, stooping, kneeling, and crouching, no crawling and no climbing of ladders, ropes, or scaffolds, no exposure to unprotected heights, moving mechanical parts, humidity, wetness, dust, odors, fumes, and pulmonary irritants, and occasional operation of a motor vehicle, and moderate exposure to noise, such as an office. Dr. Karo stated that none of the claimant's impairments affected her hearing or visions. Dr. Karo indicated the claimant's eczema pain significantly limited the use of her hands and her neck and back pain limited physical activity and endurance.

> However, Dr. Karo's opinion is not persuasive because it contains inconsistencies, particularly relating to the reduced sitting, standing, and walking capacity, as well as the limitations for occasional use of upper extremities for reaching, overhead reaching, occasional fingering, pushing, and pulling. She had stated there were no physical limitations to sitting,

26

standing, and walking, which is supported her observations that there was no evidence of significant muscle atrophy, and her muscle strength was a generalized 5/5. The claimant had normal muscle tone and normal sensation. There was no abnormal issues with coordination, as she was able to do her finger-to-nose testing and her coordination was intact. Dr. Karo later reduced the total hours the claimant would be able to sit, stand, and walk. While Dr. Karo may have been accounting for the claimant's subjective pain complaints, Dr. Karo's more restrictive limitation are not consistent with her treatment history, the claimant's activities of living, or supported by her own examination findings. Dr. Karo accounted for the claimant's subjective hand pain complaints; however, her more restrictive limitation for reaching, pushing, pulling, occasional fingering and handling is not consistent with the claimant's limited course of treatment or supported by Dr. Karo's own clinical examination findings that showed the claimant had intact coordination, was able to do finger-to-nose testing [and] had normal muscle tone and strength in her upper extremities. There was also no evidence of muscle atrophy [which] is a common side effect of prolonged and/or chronic pain due to lack of use of a muscle in order to avoid pain. It is also not consistent with the claimant's reports that she texts, prepares her own meals, shop[s] online, text[s], [and] attend[s] to her personal care, as detailed herein.

(Tr. 820–21) (internal citations to the record omitted).

Ms. Kujawa argues that the ALJ's discussion of supportability was not supported by substantial evidence, for the same reason that his discussion of Dr. Heuring's opinion was not supported—the ALJ relies on the "same illogical medical findings."

With respect to consistency, Ms. Kujawa again argues that the ALJ improperly relied on her activities of daily living, when there was "no suggestion that she was compelled to perform work around her home either full-time or on any set schedule, nor any indication that these activities were regulated by anything other than her desires at the time she did them."

For the same reasons I discussed above, I disagree with these arguments. This case is not like *Guttu v. Comm'r of Soc. Sec.*, No. 1:19CV2593, 2020 WL 5814497 (N.D. Ohio Sept. 30, 2020), wherein the ALJ did not significantly discuss the treating physician's opinion, discounting it based almost entirely on activities of daily living that predated the alleged onset date. *Id.* at *6.

27

Here, in contrast, the ALJ thoroughly discussed the opinion and explained how the opined disabling limitations were not supported or consistent with other objective and other evidence in the record. In doing so, the ALJ relied in part on activities of daily living that were reported and consistent through the alleged disability period, using those ADLs as one factor among many for finding Dr. Karo's opinion to be less than persuasive.

I am confident that the ALJ complied with the regulations in evaluating these opinions, and that his conclusions are supported by substantial evidence. Accordingly, I recommend that the Court overrule Ms. Kujawa's first two assignments of error.

In her third assignment of error, Ms. Kujawa contends that the ALJ erred in evaluating her statements about her symptoms and limitations.

SSR 16-3p provides that the SSA will conduct a two-step process in considering a claimant's symptoms. 2017 WL 5180304, at *3 (Oct. 25, 2017). At step one, the SSA determines whether the individual has one or more medically determinable impairments that could reasonably be expected to produce the individual's alleged symptoms. *Id.* If so, at step two, the SSA evaluates the intensity and persistence of a claimant's symptoms, such as pain, to determine the extent to which those symptoms limit the claimant's ability to work. *Id.* at *4.

With respect to a claimant's subjective statements, SSR 16-3p provides that the SSA will "consider an individual's statements about the intensity, persistence, and limiting effects of symptoms" and "will evaluate whether the statements are consistent with objective medical evidence and the other evidence." *Id.* at *6. SSR 16-3p identifies seven factors that the SSA will consider in evaluating an individual's symptoms: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate symptoms; (4) the type, dosage, effectiveness, and side effects of any medication; (5) treatment an

28

individual receives or has received other than medication; (6) any measures other than treatment an individual uses or has used; and (7) any other factors concerning the claimant's functional limitations and restrictions. *Id.* at \*7–8. "The ALJ need not analyze all seven factors but should show that she considered the relevant evidence." *Phillips v. Comm'r of Soc. Sec.*, No. 3:22-CV-01144-JGC, 2023 WL 4078204, at \*8 (N.D. Ohio Apr. 4, 2023), *report and recommendation adopted*, 2023 WL 5602726 (N.D. Ohio Aug. 30, 2023).

Notably, "[a] plaintiff does not demonstrate a violation of SSR 16-3p simply by reiterating the same subjective symptoms she believes should have been credited by the ALJ, as an ALJ is not required to accept a claimant's subjective complaints." *Zingale v. Kijakazi*, No. 1:20-cv-02197, 2022 WL 824148, at \*8 (N.D. Ohio Mar. 18, 2022); *see also Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) ("an ALJ is not required to accept a claimant's subjective complaints"). Moreover, "[i]t is for the administrative law judge, not the reviewing court, to judge the consistency of a claimant's statements." *Lipanye v. Comm'r of Soc. Sec.*, 802 F. App'x 165, 171 (6th Cir. 2020). However, while determinations regarding subjective complaints rest with the ALJ, "those determinations must be reasonable and supported by substantial evidence." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 249 (6th Cir. 2007); *see also Kurman v. Comm'r of Soc. Sec.*, No. 1:20-cv-01837, 2022 WL 765072, at \*3 (N.D. Ohio Mar. 14, 2022) ("The ALJ's decision . . . must be rooted in the record and must contain specific reasons for the weight given to the [claimant's] symptoms.") (quotations omitted).

Ms. Kujawa insists that her allegations about the intensity, persistence, and functionally limiting effects of her hand symptoms from atopic dermatitis were substantiated by objective medical evidence. She points out that she never achieved complete remission, despite treatment. She repeats that the ALJ mischaracterized her course of treatment as conservative and relied on

normal physical examination findings like full strength and intact range of motion, which "are of little probative value as they are not the signs and symptoms of atopic dermatitis."

This is, again, a straightforward "cherry-picking" argument. While Ms. Kujawa points to evidence in the record that she believes should have supported a different result, "the Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477; *see also Anderson v. Comm'r of Soc. Sec.*, No. 1:21-CV-1471, 2022 WL 4545188, at *2 (N.D. Ohio Sept. 29, 2022) ("it is also well-established that as long as the ALJ cites substantial, legitimate evidence to support the conclusion reached, the reviewing court may not second-guess that decision").

Here, the ALJ accurately and thoroughly summarized the treatment record and discussed Ms. Kujawa's activities of daily living in conjunction with the objective medical evidence. *See Napier v. Comm'r of Soc. Sec.*, 127 F.4th 1000, 1006 (6th Cir. 2025) (no reversible error where the ALJ relied on the claimant's activities of daily living and "carefully analyzed the entirety of the record evidence regarding [claimant's] ability to function, using [claimant's] statements regarding her activities only as one factor among many"); *Laney v. Comm'r of Soc. Sec.*, No. 5:21-CV-01290-CEH, 2022 WL 2176539, at *8–9 (N.D. Ohio June 16, 2022) (holding that ALJ did not err in relying on claimant's reports of daily activities in conjunction with objective medical evidence).

As the Commissioner points out, the ALJ acknowledged Ms. Kujawa's complaints and testimony regarding her dermatitis and limitations. (Tr. 811.)

The ALJ then considered the objective medical evidence, thoroughly summarizing her dermatological course of treatment, acknowledging that she continued to complain of pain despite standard treatment of prescription ointments and trialing Dupixent. (Tr. 813–14). The ALJ also

acknowledged that she was observed to have scaly skin on her palms, even at a more recent appointment. (*Id.*) The ALJ acknowledged that Ms. Kujawa can be reasonably expected to experience pain, but the ALJ accurately noted that Ms. Kujawa had managed without surgical intervention or pain management. (*Id.*) The ALJ noted Ms. Kujawa's activities of daily living and explained that they were inconsistent with a conclusion that her atopic dermatitis presented disabling limitations. (Tr. 817.)

In short, the ALJ's analysis was sufficient to satisfy SSR 16-3p. *See, e.g., White v. Comm'r of Soc. Sec.*, NO. 1:25-CV-1050, 2026 WL 261558 (N.D. Ohio Feb. 2, 2026) (ALJ complied with SSR 16-3p where the ALJ thoroughly and accurately summarized the claimant's allegations and testimony, then reasonably found that those allegations were not fully supported, discussing and reasonably weighing the record evidence). Accordingly, I recommend that the Court overrule Ms. Kujawa's third assignment of error.

**VI.    RECOMMENDATION**

Based on the foregoing, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

Dated:  April 22, 2026

/s/ *Jennifer Dowdell Armstrong*
Jennifer Dowdell Armstrong
U.S. Magistrate Judge

## VII.  NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates

32

Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878–79 (6th Cir. 2019).